Filed 7/24/14  P. v. Gastelum CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063651 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD244193) |
| JOHN MICHAEL GASTELUM, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed.

Denise Rudasill, by appointment of the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Amanda E. Casillas, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted John Michael Gastelum of one count of felonious possession of metal knuckles (count 1: Pen. Code,[1] § 21810) and one count of misdemeanor resisting, delaying, or obstructing a police officer (count 2: § 148, subd. (a)(l)). Prior to trial, the court denied Gastelum's motion in limine to exclude evidence that police had found airsoft rifles—which Gastelum acknowledges "looked just like real rifles"—leaning against an inside wall of the garage where police found him hiding.

After the People rested their case-in-chief, the court denied without prejudice Gastelum's motion to reduce the possession-of-metal-knuckles charge from a felony to a misdemeanor under subdivision (b) of section 17 (hereafter § 17(b)). Also, Gastelum admitted an allegation he had suffered a prior strike within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, 668) as a result of a 2006 juvenile court adjudication that he had committed an assault with a deadly weapon (§ 245, subd. (a)(1), 1192.7, subd. (c)(23)).

During the sentencing hearing, the court denied Gastelum's motion under section 17(b) to reduce his possession-of-metal-knuckles conviction from a felony to a misdemeanor. However, the court granted Gastelum's motion to strike his prior strike. The court then sentenced him to the middle state prison term of two years for his count 1 conviction and to time served for his count 2 conviction of misdemeanor resisting arrest.

Gastelum raises three contentions on appeal. First, he contends his convictions of should be reversed because the court prejudicially abused its discretion and violated his

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

federal constitutional right to due process by admitting evidence that police found airsoft rifles—which they initially believed were real rifles—in the garage where they found him hiding. Second, Gastelum alternatively contends the court abused its discretion by denying his motion under section 17(b) to reduce his possession-of-metal-knuckles conviction from a felony to a misdemeanor. Last, he contends the court erred by failing to grant him probation because "an analysis of the criteria affecting probation under [California Rules of Court[2]] rule 4.414 supported a grant of probation."

We reject these contentions and affirm the judgment.

## FACTUAL BACKGROUND

### A. *The People's Case*

Gastelum's girlfriend, Kufanya Appling, testified that in late October 2012 Gastelum was spending two or three nights a week with her at her home in San Diego. Gastelum and Appling shared a bedroom there. He kept his clothing on the left side of the bedroom closet, and she kept hers on the right side. Appling did Gastelum's laundry and hung his clothes in the closet.

On October 30, 2012, at around 6:15 p.m., Sergeant Tina Williams, Officers Michael De Witt, Errick Barnes and Bart Lane, other unnamed officers, and Detective Jesse Zaldivar, all of whom were employed by the San Diego Police Department, arrived at Appling's residence to conduct a lawful search. Detective Zaldivar testified that, as they were driving up to the residence, he "heard a female talking on the phone saying,

---

2      All further rule references are to the California Rules of Court.

3

'[t]he police are coming.'" Immediately thereafter, several individuals left the residence. The officers secured the perimeter of the residence by surrounding both the home and the detached garage.

Sergeant Williams testified that one of the officers in the back yard said he had heard noises coming from the garage. After conducting a security sweep of the house, the officers focused on the garage where they thought somebody was hiding inside. The officers announced their presence several times and instructed anyone inside the garage to come out. Sergeant Williams testified the interior of the garage was dark and "very cluttered," and the officers were able to see "only a couple feet" into the garage with the lighting from the house. Some areas of the garage were filled with crates, cartons, and bags stacked five feet high.

As the officers again announced their presence, Sergeant Williams looked into the right side of the garage door and observed rifles leaning back against the interior of the garage. Sergeant Williams directed another officer to reach inside and pull the rifles out.

At that point, the officers discovered the rifles were airsoft rifles, which use plastic pellets as ammunition. Sergeant Williams testified, however, that when she saw the rifles in the garage, she feared that there were other weapons in the garage and that whoever was hiding inside might be armed.

After the officers unsuccessfully attempted to use a mirrored pole to locate the person hiding in the garage, the officers deployed pepper spray into the garage through a vent. However, given the size of the garage, Sergeant Williams soon realized the pepper spray would not have any effect on the person hiding inside of the garage. The officers

4

then used a pepper ball gun, which is similar to a paintball gun, to deploy two pepper balls into two corners of the garage to try to get the person hiding inside of the garage to come out. The officers continued to announce their presence and order the person inside the garage to come out.

The pepper spray produced no results, so the officers had to physically enter the garage. When Officer DeWitt entered the garage, he felt the effects of the pepper spray. He was coughing and his eyes were watery. Officer Barnes also felt the effects of the pepper spray.

Sergeant Williams also testified she found Gastelum hiding underneath a large plastic five-gallon crate lid. She stated that Gastelum resisted the officers' efforts to place him in handcuffs by "trying to pull away and shift and drop his body weight."

Officer DeWitt testified that as he began to pat Gastelum down for weapons, Gastelum, who had been handcuffed, "immediately stood to his feet" and "[k]ind of stomped his feet." Gastelum attempted to pull his shoulder away from Officer DeWitt and began "thrashing his body." During the patdown, Gastelum continued this behavior and angrily said, "Man, fuck you guys." As Gastelum was being escorted out of the garage, he continued to pull his shoulders away from Officer DeWitt's grip, stomped his feet, and pulled his body in different directions. Gastelum eventually submitted to the officers and said, "Okay. Officers, I'm sorry. I'm done." Gastelum's demeanor changed and he became cooperative.

Detective Zaldivar testified he spoke with Appling when he entered her residence that evening. After informing him that she and Gastelum lived together there, Appling

5

pointed to the bedroom and referred to it as "our bedroom."  She admitted some of Gastelum's belongings were stored in their bedroom.

Detective Zaldivar asked Officer Lane to search the bedroom closet.  Officer Lane testified he found black metal knuckles inside the back pocket of a blue pair of shorts he found hanging in the left side of the closet where men's clothing was stored.

Appling testified she remembered hanging those blue shorts in the closet, that the shorts belonged to Gastelum, and she previously had seen him wearing them.

Detective Zaldivar testified Gastelum's cellular phone and identification card were found in the dining room.  A photo found on Gastelum's cellular phone showed him wearing a jacket with a white and blue collar and white sleeves.  This same jacket was found inside of the bedroom closet that Gastelum shared with Appling.

B.  *The Defense*

The defense rested without presenting any witnesses.

DISCUSSION

I.  *ADMISSION OF THE AIRSOFT RIFLE EVIDENCE*

Gastelum first contends his convictions should be reversed because the court prejudicially abused its discretion and violated his federal constitutional right to due process by admitting evidence that police found airsoft rifles─which they initially believed were real rifles─in the garage where they found Gastelum hiding.  In support of this contention, Gastelum asserts this evidence was "completely irrelevant" and should have been excluded under Evidence Code section 352 because it was "more prejudicial

6

than probative." We reject Gastelum's contention because he has failed to demonstrate the claimed evidentiary error was prejudicial or rendered his trial fundamentally unfair.

A. *Background*

1. *Gastelum's in limine motion*

Gastelum brought an in limine motion to exclude evidence of guns (the airsoft rifles), ammunition magazines, ammunition, and gas masks that were found in the garage where police had found him hiding. Gastelum argued this evidence should be excluded under Evidence Code section 352 because the evidence was irrelevant, it "could confuse the actual issue of what he is alleged to have possessed," and it was more prejudicial than probative.

During the hearing on the motion, the prosecution informed the court it intended to introduce this evidence in order to explain the officers' reaction to finding this evidence, which included their deployment of pepper spray into the garage. The prosecution also argued this evidence was relevant to show consciousness of guilt because even after the officers repeatedly warned Gastelum—following their discovery of the rifles—that pepper spray would be deployed, he chose to stay in the garage.

a. *Ruling*

The court denied Gastelum's in limine motion, finding that the challenged evidence had "significant probative value in terms of consciousness of guilt in count 1 [(possession of metal knuckles)]," the introduction of this evidence would not "confuse or mislead the jury," and the evidence was not unduly prejudicial.

7

After issuing its ruling, the court noted that there had been a lot of media coverage regarding the use of pepper spray by law enforcement and that the issue of whether police were using pepper spray unnecessarily was "a topic of some interest to the public at large."  The court indicated that, in light of the media attention to this issue, the jury should "know the context" in which the police used pepper spray in this case.  The court mentioned that the defense could argue that Gastelum was not actually resisting arrest, as charged in count 2, but rather he was merely reacting to the pepper spray.

2. *Stipulation at trial*

Outside the presence of the jury, after Sergeant Williams and Officer DeWitt testified, the prosecutor requested with respect to the count 2 resisting-arrest charge that the defense "stipulate to the fact that these officers were in lawful performance" of their duties.  Defense counsel did not oppose the request.

The parties drafted and presented to the court the following stipulation:  "Both the People and the defense stipulate that the San Diego Police Department executed a lawful search of Mr. Gastelum and a lawful search of the residence . . . on October 30th, 2012. [¶] Both parties further stipulate that all law enforcement personnel on scene that day carried out their duties in a lawful manner."

The court thereafter read the stipulation to the jury.  The court explained to the jury that it should not focus on or wonder about whether law enforcement was lawfully present at the residence or whether the search was lawful.  The court also explained that "[i]t was a lawful search of Mr. Gastelum and the premises, and all the law enforcement

8

personnel there on the scene at that time carried out their duties in a lawful manner."  The court instructed the jury to accept those facts.

B.  *Applicable Legal Principles*

1.  *Evidence Code sections 350 and 210*

Evidence Code section 350 provides that only relevant evidence is admissible. Evidence Code section 210 defines relevant evidence as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

2.  *Evidence Code section 352*

"When an objection to evidence is raised under Evidence Code section 352,[3] the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption.  Unless these dangers 'substantially outweigh' probative value, the objection must be overruled."  (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.)  Thus, evidence is properly excluded under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (§ 352; *Cudjo*, at p. 609.)

---

3    Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The California Supreme Court has explained that "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which *uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues*. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638, italics added.)

3. *Due process*

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 439, italics omitted; see *People v. Benavides* (2005) 35 Cal.4th 69, 91 ["[G]enerally, violations of state evidentiary rules do not rise to the level of federal constitutional error."].)

4. *Standard of review*

"A trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence." (*People v. Carter* (2005) 36 Cal.4th 1114, 1166-1167.) We review "for abuse of discretion a decision on admissibility that turns on the relevance of the evidence in question." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) We also review the trial court's rulings under Evidence

Code section 352 for an abuse of discretion. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.)

Under the abuse-of-discretion standard of review, a trial court's exercise of discretion in admitting or excluding evidence will not be disturbed and reversal of the judgment is not required "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Error in the admission or exclusion of evidence following an exercise of discretion under Evidence Code section 352 is tested for prejudice under the *Watson*[4] harmless error test. (See *People v. Alcala* (1992) 4 Cal.4th 742, 790-791.) Under the *Watson* test, the trial court's judgment may be overturned only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson, supra,* 46 Cal.2d at p. 836.)

C. *Analysis*

In support of his claim the court erred by admitting evidence that the police found airsoft rifles in the garage where they found him hiding, Gastelum first asserts the evidence was not relevant to any issue in dispute in this case. Gastelum cites *People v. Lucero* (1998) 64 Cal.App.4th 1107 for the proposition that "[e]vidence that goes to the issue of reasonableness of the officers' conduct or the lawfulness of the arrest is not admissible if the legality of the arrest is not an issue in the case because under those

---

4       *People v. Watson* (1956) 46 Cal.2d 818.

circumstances the evidence is irrelevant." Here, he argues, "the reasonableness or lawfulness of the officers' conduct in arresting [him] was not an issue the jury had to decide" because he stipulated that they were lawfully pursuing their duties when they arrested him and when they searched the residence where they found him. Gastelum also asserts the court should have excluded the airsoft rifle evidence under Evidence Code section 352 because the evidence was "highly prejudicial as it likely led the jury to believe [he] was the type of person who possessed dangerous weapons in general, and to possibly speculate that he may have possessed the [airsoft rifles] for a nefarious purpose." Thus, he maintains, the evidence was "inadmissible as it was more prejudicial than probative."

Assuming without deciding that the court erred by admitting the airsoft rifle evidence, we conclude Gastelum's claim of evidentiary error is unavailing because he has failed to demonstrate any such error was prejudicial or rendered his trial fundamentally unfair. Gastelum contends that admission of this evidence was prejudicial because there is a reasonable chance he would have obtained a better result at trial if that evidence had been excluded. Specifically, he asserts "[t]his is because the evidence of [his] guilt was not overwhelming and . . . this improperly admitted evidence likely led the jury to convict [him] of the possession of metal knuckles because it believed he likely possessed that weapon because he had other weapons." These contentions are unavailing because the evidence of Gastelum's guilt as to both counts is strong and he has failed to demonstrate it is reasonably probable he would have obtained a more favorable result at trial in the absence of the assumed evidentiary error.

12

1. *Count 1*

Regarding count 1, the record shows the court properly instructed the jury under CALCRIM No. 2500 that in order to prove Gastelum was guilty of possession of metal knuckles in violation of section 21810, the People were required to prove that (1) he possessed the metal knuckles, (2) he knew he possessed the metal knuckles, and (3) he knew "the object was metal knuckles, a weapon that may be used for the purposes of offense or defense." The court also properly instructed the jury that the People were not required to prove that Gastelum intended to use the metal knuckles as a weapon or that he carried the metal knuckles on his person. It further instructed the jury that possession of the metal knuckles could be constructive and that "[t]wo or more people may possess something at the same time."

Here, the evidence strongly supports the jury's finding that the prosecution met its burden of proving all three elements of count 1. Regarding the first two elements of count 1 (possession and knowledge of possession), the testimony of Gastelum's girlfriend, Appling—who reluctantly testified under a grant of use immunity—established that Gastelum spent the night with her two or three times a week at her home where the police found him hiding in the garage, and he shared the bedroom and the bedroom closet with her. Appling testified that Gastelum kept his clothing on the left side of the bedroom closet, and she kept hers on the right side. She also testified that she did his laundry and hung his clothes in the closet.

Officer Lane testified he found the metal knuckles inside the back pocket of a blue pair of shorts he found hanging on the left side of the closet the men's clothing was

13

stored. Appling testified she remembered hanging those blue shorts in the closet and she previously had seen him wearing those shorts.

Appling's testimony was corroborated by Detective Zaldivar, who testified that Appling informed him that she and Gastelum lived together in her home, they shared the bedroom, and he kept some of his belongings in the bedroom. Detective Zaldivar also testified that Gastelum's cellular phone and identification card were found in the dining room during a lawful search of the home,[5] and a photo found on Gastelum's cellular phone showed him wearing a jacket with a white and blue collar and white sleeves. Detective Zaldivar stated that this same jacket was found inside the bedroom closet that Gastelum shared with Appling.

The foregoing evidence strongly supports the jury's finding that Gastelum knowingly possessed the metal knuckles that Officer Lane found in Gastelum's shorts in the closet.

The evidence also supports the jury's finding that the prosecution met its burden of proving the third element of count 1. Detective Zaldivar testified the metal knuckles were painted black and had "four round openings near the top," and "[b]elow that . . . [was] a flattened little bar at the bottom." Detective Zaldivar testified that metal

---

5　In the People's trial brief, the prosecutor asserted that the search of Gastelum's residence was a "lawful parole search" conducted "pursuant to a valid 4th Amendment waiver." During pretrial proceedings, the court found there were no "Fourth Amendment issues" because the search of the home was a "lawful parole search." At trial, as already noted, the court read to the jury the parties' stipulation that the search was lawful and all law enforcement personnel carried out their duties in a lawful manner.

14

knuckles like the ones found in Gastelum's shorts are used "as a weapon" to strike or hit someone.

All of the foregoing evidence strongly supports the jury's findings that Gastelum constructively possessed the metal knuckles at the time of his arrest, he knew he possessed the metal knuckles, and he knew they were a weapon. Thus, we conclude Gastelum has failed to demonstrate a reasonable probability the jury would have acquitted him of count 1 if the court had excluded the airsoft rifle evidence.

2. *Count 2*

The evidence also strongly supports Gastelum's conviction of count 2. The record shows the court properly instructed the jury under CALCRIM No. 2656 that in order to prove Gastelum was guilty of resisting a peace officer in violation of section 148(a), the People were required to prove that (1) the police officers in this case were lawfully performing or attempting to perform their duties as peace officers; (2) Gastelum willfully resisted, obstructed, or delayed the officers in the performance or attempted performance of those duties; and (3) when he acted, Gastelum knew or reasonably should have known the officers were peace officers performing or attempting to perform their duties.

Here, the evidence strongly supports the jury's finding that the prosecution met its burden of proving all three elements of count 2. Regarding the first element, as noted, *ante*, the parties stipulated that "all law enforcement personnel on scene that day carried out their duties in a lawful manner."

Regarding the second element, the prosecution presented evidence showing that when the officers found Gastelum hiding inside of the garage, he resisted the officers'

15

efforts to place him in handcuffs. Specifically, Sergeant Williams testified that Gastelum resisted the officers' efforts to place him in handcuffs by "trying to pull away and shift and drop his body weight." Officer DeWitt testified that as he began to pat Gastelum down for weapons, Gastelum, who had been handcuffed, attempted to pull his shoulder away from him "thrashing his body." Officer DeWitt also testified that Gastelum continued to pull his shoulders away from his grip, stomped his feet, and pulled his body in different directions as he was being escorted out of the garage.

Regarding the third element, the prosecution presented strong circumstantial evidence that Gastelum knew or should have known the officers were peace officers by presenting testimony that the officers repeatedly announced their presence as such when they were ordering him to come out of the garage. Furthermore, as noted, Gastelum stipulated that the officers were there to perform their duties.

In light of the strong foregoing evidence supporting Gastelum's conviction of counts 1 and 2, we conclude he has failed to meet his burden of showing he was prejudiced by the introduction of the airsoft rifle evidence. His contention that the court violated his federal constitutional right to due process by admitting this evidence, is unavailing. (*People v. Benavides*, *supra*, 35 Cal.4th at p. 91 ["[G]enerally, violations of state evidentiary rules do not rise to the level of federal constitutional error."].)

16

## II. *DENIAL OF GASTELUM'S MOTION TO REDUCE HIS COUNT 1 CONVICTION FROM A FELONY TO A MISDEMEANOR*

Gastelum alternatively contends the court abused its discretion by denying his motion under section 17(b) to reduce his count 1 possession-of-metal-knuckles conviction from a felony to a misdemeanor. We reject this contention.

A. *Background*

Before the jury returned its verdicts, as already noted, Gastelum brought a motion under section 17(b) to reduce the possession-of-metal-knuckles charge from a felony to a misdemeanor. Defense counsel asserted that "the conduct in this case is possession of brass knuckles, which in the scheme of weapons is . . . low on the chain. [T]his is not a knife. It's not a gun. It's not a baseball bat or anything like that. Although it is a weapon and it can be used to cause injuries, it's none of those." Counsel also asserted that the metal knuckles "were not found on this person." The prosecutor argued that "[w]hen you look at the facts of this case, you . . . have a young man who is hiding from police, . . . resisting arrest, cursing, . . . flailing around . . . , forcing officers to resort to pepper spray after initial attempts to get him to be compliant with the Fourth [Amendment] waiver for [his California Youth Authority] status." The court denied the motion without prejudice to its renewal at sentencing.

Following his conviction of count 1, Gastelum renewed his section 17(b) motion at his sentencing hearing. Defense counsel asserted that "brass knuckles on the scale of dangerous weapons are pretty low." He also asserted that the metal knuckles "were not on his person. These were far away, separate from him, lost in a pair of shorts and

17

weren't in any danger of being used." The court replied that Gastelum "was found in the garage because somebody said the police are coming. And rather than run out like the others did, he chose to hide himself in the garage." The court added, "That doesn't mean they weren't in his immediate presence at some other time."

Following additional arguments by the parties, the court denied Gastelum's motion, stating that Gastelum may at some point become eligible for a reduction of his felony conviction to a misdemeanor, but that he first would have to earn that right by turning his life around.

B. *Applicable Legal Principles*

In *People v. Sy* (2014) 223 Cal.App.4th 44, this court recently explained that trial courts have "broad discretion under section 17[(b)] in deciding whether to reduce a wobbler[6] offense to a misdemeanor." (*Sy* at p. 66, citing *Alvarez, supra*, 14 Cal.4th at p. 977.) We also explained that a trial court's decision to grant or deny a section 17(b) motion will not be disturbed on appeal "unless the party attacking the decision clearly shows the decision was irrational or arbitrary." (*Sy, supra*, 223 Cal.App.4th at p. 66.) "Absent such a showing, we presume the court acted to achieve legitimate sentencing objectives." (*Ibid.*)

---

6    A "wobbler" offense is a crime that, in the trial court's discretion, may be sentenced as either a felony or a misdemeanor. (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 974 (*Alvarez*).)

C. *Analysis*

A violation of section 21810 is a wobbler offense in that the trial court has discretion to deem it to be a misdemeanor or a felony for purposes of sentencing. (See § 21810; see *Alvarez, supra*, 14 Cal.4th at p. 974.)

Here, during sentencing the court declined to designate Gastelum's count 1 section 21810 offense as a misdemeanor, stating: "I don't know how convinced I am that [Gastelum] has really removed himself or divorced himself from the gang lifestyle, the gang culture."[7]

We are satisfied the court properly exercised its sentencing authority under section 17(b). The court was aware of its discretionary authority and stated a valid reason for its decision to treat Gastelum's current possession-of-metal-knuckles offense as a felony for purposes of sentencing. The record does not demonstrate any abuse of discretion.

## III. *DENIAL OF PROBATION*

Last, Gastelum contends the court erred by failing to grant him probation because "an analysis of the criteria affecting probation under rule 4.414 supported a grant of probation." We also reject this contention.

A. *Background*

During the sentencing proceeding, the court noted it had read and considered the probation report, which stated that Gastelum—who was then 24 years of age—was statutorily ineligible for a grant of probation because he had suffered a prior strike

---

7    At trial, the court excluded evidence of Gastelum's history as a member of a criminal street gang.

19

conviction. It also read and considered the People's sentencing statement and opposition to Gastelum's *Romero*[8] motion to strike his 2006 prior strike conviction.

The court granted Gastelum's motion to strike his prior strike for purposes of sentencing, but found he was not a suitable candidate for probation. The trial court explained, "I can't go further than that and find that . . . he's a suitable candidate for probation. His prior record belies that, . . . [and] the Court's given him every consideration he's entitled to by striking the strike, but . . . still, in my view, . . . the only appropriate disposition is to commit him to the Department of Corrections. But rather than a four-year term, it would be . . . a two-year term, mid term."

B. *Applicable Legal Principles*

Rule 4.414, which sets forth certain criteria relevant to the trial court's decision to grant or deny probation, provides in part:

> "Criteria affecting the decision to grant or deny probation include facts relating to the crime and facts relating to the defendant.
>
> "(a) Facts relating to the crime
>
> "Facts relating to the crime include:
>
> "(1) The nature, seriousness, and circumstances of the crime as compared to other instances of the same crime;
>
> "(2) Whether the defendant was armed with or used a weapon; [¶] . . .
>
> "(4) Whether the defendant inflicted physical or emotional injury;
>
> "(5) The degree of monetary loss to the victim;

---

8       *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

"(6) Whether the defendant was an active or a passive participant;

"(7) Whether the crime was committed because of an unusual circumstance, such as great provocation, which is unlikely to recur;

"(8) Whether the manner in which the crime was carried out demonstrated criminal sophistication or professionalism on the part of the defendant. . . ."

"(b) Facts relating to the defendant

"Facts relating to the defendant include:

"(1) Prior record of criminal conduct, whether as an adult or a juvenile, including the recency and frequency of prior crimes; and whether the prior record indicates a pattern of regular or increasingly serious criminal conduct;

"(2) Prior performance on probation or parole and present probation or parole status;

"(3) Willingness to comply with the terms of probation;

"(4) Ability to comply with reasonable terms of probation as indicated by the defendant's age, education, health, mental faculties, history of alcohol or other substance abuse, family background and ties, employment and military service history, and other relevant factors;

"(5) The likely effect of imprisonment on the defendant and his or her dependents; [¶] . . .

"(7) Whether the defendant is remorseful; and

"(8) The likelihood that if not imprisoned the defendant will be a danger to others."

"In deciding whether to grant or deny probation, a trial court may also consider additional criteria not listed in the rules provided those criteria are reasonably related to that decision. (Rule 4.408(a).) A trial court is generally required to state its reasons for

21

denying probation and imposing a prison sentence, including any additional reasons considered pursuant to rule 4.408. (Rules 4.406(b)(2) & 4.408(a).) Unless the record affirmatively shows otherwise, a trial court is deemed to have considered all relevant criteria in deciding whether to grant or deny probation or in making any other discretionary sentencing choice. (Rule 4.409.)" (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1313.)

1. *Standard of review*

"The grant or denial of probation is within the trial court's discretion and the defendant bears a heavy burden when attempting to show an abuse of that discretion." (*People v. Aubrey* (1998) 65 Cal.App.4th 279, 282.) In reviewing a trial court's decision to grant or deny probation, "it is not our function to substitute our judgment for that of the trial court. Our function is to determine whether the trial court's order granting [or denying] probation is arbitrary or capricious or exceeds the bounds of reason considering all the facts and circumstances." (*People v. Superior Court* (*Du*) (1992) 5 Cal.App.4th 822, 825.)

"[I]n determining whether a trial court abused its discretion by denying probation, we consider, in part, whether there is sufficient, or substantial, evidence to support the court's finding that a particular factor was applicable." (*People v. Weaver, supra*, 149 Cal.App.4th at p. 1313.)

C. *Analysis*

Although Gastelum—as the court found and he acknowledges—initially was ineligible for probation by statute due to his prior strike conviction, he became eligible

22

for consideration for a grant of probation when the court granted his *Romero* motion to strike his 2006 strike conviction. Gastelum contends the court abused its discretion in denying his request for probation because (1) his illegal possession of metal knuckles was "less serious than a typical possession of a deadly weapon in general" because most other deadly weapons are more dangerous; (2) his offense was "less serious than the usual possession of metal knuckles" because he was not carrying them on his person; (3) he "was not armed with and did not use a weapon during his crimes as the metal knuckles were not found on his person"; (4) there were no victims; (5) he did not inflict emotional or physical injury on anyone; (6) his crime "was not particularly sophisticated as it involved simple possession of metal knuckles"; (7) only one of his prior convictions was a violent felony; (8) his current conviction "showed a pattern of de-escalating criminal conduct as it involved a wobbler"; (9) he had remained out of custody during the 10-month period prior to his arrest in this case; (10) he was willing and able to comply with the terms of probation; and (11) incarceration will have an adverse effect on him, his toddler daughter, and her mother (Appling).

Based on our review of the record we conclude the trial court did not abuse its discretion by denying Gastelum probation. The probation report shows Gastelum has an extensive criminal history and he "performed poorly while on juvenile probation." His criminal history began in April 2000 when he was 11 years old, and, as the Attorney General points out, he "has been in an out of trouble ever since."

Gastelum's most serious offense (the strike prior), which he committed in 2006, involved his beating rival gang members with a golf club. He was committed to the

23

California Youth Authority and was paroled in early December 2009. Four months later, in April 2010, Gastelum's parole was revoked and he was returned to custody. He was released again in October 2010, but again he violated his parole and he was returned to custody four months later in February 2011. He was released from custody in December 2011, and committed the instant offenses 10 months later in October 2012 while he was still on parole.

Thus, although Gastelum's current convictions are his first convictions since his 2006 strike offense, he was only out of custody for a total of 18 months during that period of time, and he had violated his parole twice prior to committing his current offenses.

In addition to his extensive criminal record and his poor performance on juvenile probation and parole, various additional factors weigh against the granting of probation in this matter, as Gastelum acknowledges. Specifically, he concedes (1) he was an active participant in the crimes (Rule 4.414(a)(6)); (2) there was no indication he committed the crimes due to an unusual circumstance, such as great provocation, that is unlikely to recur (Rule 4.414(a)(7)); and (3) "it cannot be argued that he was remorseful for his conduct" (Rule 4.414(b)(7)).

On the foregoing record, we cannot conclude the court's decision to deny Gastelum's request for probation was arbitrary or capricious. The court acted well within the limits of its broad legal discretion. As already noted, on appeal "it is not our function to substitute our judgment for that of the trial court" (*People v. Superior Court* (*Du*), *supra*, 5 Cal.App.4th at p. 825). That, in effect, is what Gastelum suggests we do. For all of the above reasons, we affirm the court's decision to deny probation.

24

DISPOSITION

The judgment is affirmed.

                                                                          NARES, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.